CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

NOV 16 2005

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

JUANITA M. LAWHORNE,  )
                      )
            Plaintiff, )          Civil Action No. 2:03cv00014
                      )
v.                    )          **MEMORANDUM OPINION**
                      )
JO ANNE B. BARNHARDT, )          By:  GLEN M. WILLIAMS
**Commissioner of Social**   )   Senior United States District Judge
**Security,**             )
            Defendant.    )
                      )

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Juanita M. Lawhorne, ("Lawhorne"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Lawhorne's claims for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

-1-

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record indicates that Lawhorne filed an application for SSI on or about September 9, 1999, alleging disability as of June 1, 1994, based on severe obstructive sleep apnea. (R. at 106, 117.) Her claim was denied initially and upon reconsideration. (R. at 63-64, 65, 66-67.) Lawhorne then requested a hearing before an administrative law judge, ("ALJ"). (R. at 70.) The ALJ held a hearing on June 23, 2003, at which Lawhorne was represented by counsel. (R. at 395-424.)[1]

By decision dated August 29, 2003, the ALJ denied Lawhorne's claim. (R. at 24-32.) The ALJ found that Lawhorne had not engaged in substantial gainful activity since the alleged onset of her disability. (R. at 31.) The ALJ found that Lawhorne had an impairment or combination of impairments that were considered "severe," but the

---

[1] The initial hearing was held on June 27, 2001, and the ALJ denied Lawhorne's claim. However, a new hearing was held on remand on June 23, 2003, because a taping malfunction prevented the original transcript from being transcribed.

-2-

ALJ found that Lawhorne's impairments did not meet or medically equal one of the listed impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 31.) The ALJ found that Lawhorne's allegations regarding her limitations were not totally credible and that she had the residual functional capacity to perform sedentary[2], light[3] and medium[4] work that did not "expose her to heights or unusual hazards where she or others would be exposed to risk of serious harm if she were to fall asleep." (R. at 31.) The ALJ found that Lawhorne had a high school education and that she retained transferable skills from her past relevant work. (R. at 31-32.) Finally, the ALJ found that Lawhorne was able to perform her past relevant work as a owner/operator of a convenience store and, therefore, was not under a "disability" as defined by the Act at any time through the date of the decision. (R. at 31-32.) *See* 20 C.F.R. § 416.920(f) (2005).

After the ALJ issued his opinion, Lawhorne pursued her administrative appeals, (R. at 19-20), but the Appeals Council denied her request for review. (R. at 7-8.) Lawhorne then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481

---

[2]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 416.967(a) (2005).

[3]Light work is work which does not entail lifting items weighing more than 20 pounds occasionally and more than 10 pounds frequently. *See* 20 C.F.R. § 416.967(b) (2005).

[4]Medium work is work that involves lifting items weighing no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 416.927(c) (2005).

Case 2:03-cv-00014-GMW-PMS   Document 14   Filed 11/16/05   Page 3 of 27   Pageid#: 46

(2005). The case is before this court on Lawhorne's motion for summary judgment filed April 28, 2005, (Docket Item No. 10), and the Commissioner's motion for summary judgment filed May 27, 2005, (Docket Item No. 12).

## II. Facts

Lawhorne was born in 1946, which classifies her as a person of "advanced age." (R. at 397.) *See* 20 C.F.R. § 416.963(e) (2005). Lawhorne has a high school education, (R. at 398), and has past work experience as an owner/operator of a convenience store. (R. at 406.)

At the hearing, Lawhorne testified that she was no longer able to work due to her sleep apnea. (R. at 398.) Lawhorne testified that her sleep apnea caused her to have trouble sleeping at night and, as a result, she frequently fell asleep during the day. (R. at 398.) Lawhorne further noted, however, that even if she did sleep at night, she still might fall asleep during the day. (R. at 399.)

Lawhorne testified that she had begun using C-Pap and oxygen machines at night in order to help her sleep. (R. at 399.) Lawhorne testified that her sleeping spells did not follow any specific pattern and could occur anywhere from once a week to once a day. (R. at 402.) She further noted that the spells could last anywhere from a few seconds to half an hour. (R. at 402.)

Lawhorne testified that during the preceding 15 years she had primarily worked as the owner/operator of a convenience store. (R. at 406.) She stated that she worked

-4-

every day from six a.m. to 11 a.m. (R. at 407.) Lawhorne testified that her work at the convenience store required her to stock the shelves, mop the floors, run the cash register, order stock, tend to routine paperwork and occasionally pump gas. (R. at 406-07.) Lawhorne testified that stocking shelves required her to lift items weighing up to 50 pounds and that she spent 75 percent of her time on her feet. (R. at 407.)

Lawhorne testified that she stopped working in 1991 or 1992 because she was no longer able to do the work. (R. at 408.) She noted that a cashier had to remain vigilant when handling large sums of money, which she could not do if she fell asleep. (R. at 403.) Lawhorne testified that she tried to pick-up antiquing after she closed down her convenience store but was unable to do so because it required her to drive, and driving was unsafe for her because of her inability to stay awake. (R. at 408.) Lawhorne then testified that she had gone to the doctor, and the doctor had instructed her not to drive unless it was absolutely necessary. (R. at 408-09.)

Lawhorne testified that she had also had trouble breathing in the past, but it now appeared that her breathing was under control. (R. at 404.) Lawhorne noted that x-rays of her chest taken in July 2002, had revealed spots on her lungs. (R. at 404-05.) Although they were not malignant, the etiology of the spots were unknown. (R. at 405.) Lawhorne testified that her doctors had placed her on inhalers and had recently prescribed Singulair. (R. at 405-06.)

When asked why she was disabled, Lawhorne replied that her biggest problem was sleep apnea, and she had problems staying awake no matter in what activity she was engaged. (R. at 398-99.) She further testified that in order to sleep she had to

use a C-PAP machine with oxygen and that she used two liters of oxygen hooked to a humidifier at night. (R. at 399.) Lawhorne testified that C-PAP was like SIDS in infants; she said that the condition caused her to forget to breathe, so oxygen was not circulating in her body at times during sleep. (R. at 399.) However, even when she used the C-PAP machine, Lawhorne stated that she still suffered from daytime drowsiness and that there was no way of knowing when she would fall asleep during the day. (R. at 399.)

When asked how the C-PAP machine helped her, Lawhorne stated that the machine blew cold air up her nose at night, which caused the "thing in the back of [her] throat to stay open" and the oxygen from the machine helped keep her blood oxygen level up while she slept. (R. at 400.) Even when she used the machine at night, Lawhorne stated that there was no warning when she might fall asleep the next day. (R. at 400.) Because of the unpredictability of sleep onset, she was medically restricted from driving and she said that she only drove to and from medical visits. (R. at 400.) Lawhorne then stated that since she had no income, she had to go to the University of Virginia, ("UVA"), which was a 78 mile round-trip drive and that she made the trip every two to three months depending on if any complications arose. (R. at 400-01.)

Besides driving, Lawhorne testified that she had to close her business due to her sleep apnea because she kept falling asleep. (R. at 401.) She stated that she tried to keep busy, but when she was not doing anything, like sitting or standing, she would fall asleep. (R. at 401.) She stated that she did not feel tired or drowsy when she fell asleep and that she fell asleep without any warning. (R. at 401.) She further stated

-6-

that she had been talking on the telephone and sitting in a car having a conversation with other passengers and had fallen asleep. (R. at 401.) She then testified that she could go for a week without falling asleep unexpectedly or it could happen everyday; she stated that her falling asleep had no set pattern and that when she forgot to use the machine at night she felt very sleepy the next day. (R. at 402.) Lawhorne further stated that even if she used the machine at night, there was no guarantee that she would not fall asleep the next day. (R. at 402.)

Lawhorne then stated that her sleeping could last a few seconds or up to a half an hour. (R. at 402.) Lawhorne said that even if she fell asleep for a few seconds, it felt like she had slept for hours; she stated that this problem affected her going to sleep at night because she was not sleepy at normal bedtime hours. (R. at 402-03.) She then stated that when she fell asleep during the day and, therefore, could not go to sleep at night, it took her a couple of days to "get over it" and that was why she had to stop cashiering at her convenience store. (R. at 403.) Lawhorne testified that running a convenience store required her to be observant, and since she was tired all the time, she could not perform her job properly. (R. at 403.)

When asked about the other problems from which she suffered, Lawhorne stated that she had developed lung problems the previous May. (R. at 403-04.) She then stated that after several tests were administered by Dr. Barnes in July 2002, a chest x-ray reported that she had spots on her lungs, which were believed to be lung cancer. (R. at 404-05.) However, Lawhorne stated that after a biopsy was performed, the spots were found to not be cancerous, and she was then told she had some infection of the lungs. (R. at 405.) Lawhorne said that she had several biopsies performed by Dr.

-7-

Esol, which reported that the spots were shrinking, but she said that no doctor could diagnose what they were. (R. at 405.) She stated that this problem affected her breathing and that she took inhalers twice in the morning and twice at night; she said that since she started using these inhalers, she did not have to use the oxygen machine during the day. (R. at 405-06.) She also testified that she took Singulair, an asthma pill, but she did not know if it was helping her yet because she had just started the treatment. (R. at 406.)

When questioned about her past work experience, Lawhorne stated that she owned a small convenience store, where she took care of the entire business. (R. at 406.) She stated that she did everything including mopping the floors, stocking the shelves, pumping gas, working the cash register and taking care of the necessary book work. (R. at 406-07.) She stated that she had no employees and that she and her mother ran the store together. (R. at 406). When asked what she had to lift at the store on a daily basis, she stated that it varied from a case of beer or sodas to a 50-pound bag of potatoes, "just whatever needed to be stocked." (R. at 407.) She further stated that 75 percent of the time she was on her feet because she was always having to pump gas and cook. (R. at 407.)

Lawhorne then testified that she operated the convenience store from 1977 or 1978 until she had to close it in 1991 or 1992. (R. at 408.) She stated that she worked at the store seven days a week, and she was just tired and worn out. (R. at 408.) She then stated that she took a break and entered the thrift shop business, but she could not continue that work because of all the driving; she stated that she found herself falling asleep behind the wheel. (R. at 408.) After that, she tried to babysit her nephew's children, but she kept falling asleep, and she felt that it was unsafe for her

to continue to attempt to care for the child. (R. at 420.)

When asked about her daily activities, Lawhorne stated that she did cook for herself but often limited her cooking to the microwave. (R. at 409.) She further stated that she did clean house, but her cleaning was not as good as she would have liked. (R. at 409.) She testified that she could not clean her carpets and upholstery because she easily tired and had to take breaks. (R. at 409.) Lawhorne also stated that she went grocery shopping on the weekends only when her sister could drive her to the store. (R. at 410.) She testified that she could stand no more than 30 minutes before her lower back started hurting. (R. at 410.) Lawhorne also stated that she could dress herself and that she used to do genealogy as a hobby, but she could not continue with it because she had no way of safe travel to the libraries. (R. at 411.) She also stated that when she did get to the library, she fell asleep in front of the microfilm machine. (R. at 411.)

Lawhorne next testified that her weight fluctuated between 305 and 315 pounds and that she lived alone in Nelson County in her convenience store building. (R. at 412, 416-17.) However, she stated that her mother had lived with her until she died in March of 2000. (R. at 417.) Lawhorne stated that her mother suffered form Alzheimer's disease and that her sleep apnea restricted her from being able to properly supervise and care for her mother. (R. at 417.) She then testified that she had never fallen as a result of falling asleep unexpectedly. (R. at 418.) Lawhorne also stated that even though at her last ALJ hearing she was walking about two miles a day to "build up for surgery," she had not been able to keep up with the exercise due to her lung problem. (R. at 414.) She testified that she had two surgeries, both in 2000. (R. at 414-15.)

-9-

The next to testify at Lawhorne's hearing was Earl Glosser, Ph.D., a vocational expert. (R. at 419.) Glosser described Lawhorne's past work experience as semi-skilled to skilled with work experience up to medium levels as an owner/operator of a convenience store. (R. at 421.) He further testified that Lawhorne had skills which were transferable to skilled or semi-skilled jobs at the light or sedentary levels. (R. at 421.) Glosser further stated that the vocational expert's statements in the prior hearing were still relevant, relating to cashiering and counter clerk work. (R. at 421.) He stated that at the sedentary level, there were about 12,000 people in Virginia and 450,000 people in the United States as cashiers, and at the light level, there were 8,000 in Virginia and 300,000 in the United States as cashiers. (R. at 421.) He then stated that for counter clerks, there were 67,000 in the United States and 1,750 in Virginia. (R. at 421.) The ALJ then asked Glosser what impact Lawhorne's testimony about falling asleep and breathing, assuming it was accurate, would have on his findings. (R. at 422-23.) Glosser responded that her condition had two qualities of a unpredictable nature; these qualities were the length of time she may be out and when it may occur. (R. at 423.) He further testified that if she fell asleep with any reasonable frequency, sustained work would be impossible. (R. at 423.)

In rendering his decision, the ALJ reviewed Lawhorne's medical records from the University of Virginia; Dr. William E. Ramsey, M.D.; Dr. Carlos Gomez, M.D.; Dr. Thomas M. Daniel, M.D.; and Dr. Frank M. Johnson, M.D., a state agency physician.

On August 24, 1998, Lawhorne was referred to the Endocrine Clinic at UVA for weight management therapy. (R. at 185.) The report stated that Lawhorne weighed

319.25 pounds and that she was the primary caretaker of her elderly mother who suffered from Alzheimer's disease, and this impacted her ability to initiate change and commit to weight management therapy. (R. at 185.) The report also stated that Lawhorne admittedly used her mother as a scapegoat to prevent her from having to make any significant changes. (R. at 185.) The nutritionist diagnosed Lawhorne with sleep apnea, morbid obesity, hypertension, hyper thyroidism and amenorrhea. On September 11, 1998, the Endocrine Clinic reported that Lawhorne had been placed in weight management therapy for approximately eight weeks with no significant weight change. (R. at 184.) The nutritionist stated that Lawhorne saw herself as a victim and that she overate in response to her own victimization. (R. at 184.) The physician diagnosed Lawhorne with sleep apnea, morbid obesity, hypertension, hyperthyroidism and amenorrhea, and Lawhorne was prescribed Benazepril, HCTZ and Provera. (R. at 184.)

On September 18, 1998, Lawhorne was examined by the Gynecology Clinic at UVA for a follow-up of amenorrhea. (R. at 174.) The clinic performed a ultrasound to examine the endometrial stripe for hyperplasia. (R. at 174.) On October 2, 1998, the physician found no evidence of hyperplasia at that time. (R. at 173.) The physician prescribed Provera to prevent endometrial hyperplasia. (R. at 173.)

On October 12, 1998, Lawhorne had a follow-up visit at the Endocrine Clinic at UVA. (R. at 183.) The Clinic reported that Lawhorne continued to have difficulties committing to weight management. (R. at 181.) The report also stated that despite Lawhorne's agreement to attend the Alzheimer's group support meetings, she had not yet attended any sessions. (R. at 181.) The nutritionist encouraged Lawhorne to attend the Alzheimer group meetings and to read a poem entitled "The Road Less

Traveled" in order to explore and examine the issues that kept her from taking substantial steps in her growth. (R. at 181.) On October 30, 1998, the University of Virginia Department of Internal Medicine examined Lawhorne and conducted a bone density test. (R. at 158.) The physician found the parathyroid hormone to be high and wanted to discuss the results with Lawhorne; however, Lawhorne did not show up for the next appointment. (R. at 157-58.)

On March 1, 1999, the Endocrine Clinic at UVA reported that Lawhorne had a weight increase of seven pounds since the start of treatment. (R. at 180.) The report stated that the nutritionist provided Lawhorne with a copy of "healthy dividends fat gram counting" and a "fat gram counting fast food guide" and discussed a readiness to change by modeling the importance of addressing her motivational issues. (R. at 180.) On the same day, UVA Health System examined Lawhorne in a follow-up appointment. (R. at 161.) The physician's notes stated that Lawhorne complained about continuing daytime sleepiness but attributed it to the weight gain and asthma attacks, but she stated that they occurred less frequently. (R. at 161.)

On April 19, 1999, a report from Endocrine Clinic at UVA stated that Lawhorne was stuck in a chronic contemplation stage of change and that she had many issues that impeded and impacted her goals of weight reduction. (R. at 179.) The nutritionist stated that she was going to stop focusing on weight loss and focus on building self-esteem and self-efficacy instead. (R. at 179.) On June 14, 1999, the Endocrine Clinic reported that despite giving Lawhorne phone numbers for mental health counseling, the attending physician did not think that Lawhorne was trying to contact any counselors. (R. at 178.) The physician stated that she intended to confront Lawhorne about her noncompliance and to discharge Lawhorne from the clinic on the

-12-

condition that she seek out mental health counseling. (R. at 178.)

Lawhorne was sent to the Sleep Disorder Center at UVA for a sleep analysis on July 19, 1999. (R. at 169.) The report from the test stated that there were 20 apneas per hour of sleep and 4.17 hypopnea per hour of sleep with a minimum oxyhemoglobin saturation of 47.98%. (R. at 167.) It stated that there were 21.67 arousals per hour of sleep and that Lawhorne's chest wall and abdomen moved paradoxically during all apneas and hypopneas. (R. at 167.) The attending physician stated that Lawhorne's symptoms were consistent with severe obstructive sleep apnea with significant improvement on BiLevel at 20/7; however, the physician still saw mild desaturation. (R. at 167.) The physician recommended a Nasal BiLevel at 20cm $H_2O$ IPAP and 7cm $H_2O$ EPAP. (R. at 167.) On July 29, 1999, a OB/GYN report from UVA reported that the clinic had been following up with Lawhorne for approximately two and a half years for amenorrhea, which she had since a polyp was removed for irregular bleeding. (R. at 171.) The attending physician stated that tests showed that Lawhorne was postmenopausal, and in order to rule out hyperplasia secondary to her weight, a transvaginal ultrasound was performed for endometrial stripe measurement. (R. at 171.)

On August 23, 1999, Lawhorne was seen at UVA's Cancer Center Clinic for a pre-operation CT scan. (R. at 187.) The physician noted that the reading indicated a lesion in the adnexa bilaterally in her pelvis, which may have represented a functional cyst or ovarian carcinoma. (R. at 187.) The scan also showed a low density, soft tissue enlargement in the proximal tail of the pancreas, which may have represented bulky pancreatic tissue or neoplasm. (R. at 187.) The physician recommended an MRI study and a follow up for a preoperative evaluation in

-13-

preparation for the upcoming surgery. (R. at 187.) On November 8, 1999, Lawhorne visited Dr. William E. Ramsey, M.D., who performed a pulmonary function test using a Jones Pulmonary Model 2270. (R. at 188.) The findings of the test indicated that Lawhorne had a moderate restrictive lung defect without evidence of significant improvement with bronchodilators, and no significant obstructive effect was noted. (R. at 188.)

On November 23, 1999, Dr. Frank M. Johnson, M.D., completed a Physical Residual Functional Capacity Assessment on Lawhorne. (R. at 191-99.) Dr. Johnson found that Lawhorne could occasionally lift/carry items weighing 50-pounds and frequently lift/carry items weighing 25 pounds. (R. at 192.) Dr. Johnson further reported that Lawhorne could stand/walk and sit for about six hours in an eight-hour workday. (R. at 192.) He further stated that Lawhorne was unlimited in her ability to push and/or pull. (R. at 192.) Finally, Dr. Johnson stated that Lawhorne's alleged symptoms were not fully credible according to a review of the total evidence. (R. at 197.) He stated that Lawhorne said that she stopped using her C-PAP machine in July 1999 because she felt it was drying out her nose too much and because it delivered too much pressure, but by August 1999, she told her doctor that she had some decrease in daytime sleepiness frequency after using the C-PAP machine. (R. at 197.)

On July 24, 2000, Lawhorne was seen by Dr. Carlos Gomez, M.D., of UVA's Department of General Surgery. (R. at 212.) He listed his impression of Lawhorne's illnesses as morbid obesity, obstructive sleep apnea with pulmonary hypertension, hypertension secondary to amenorrhea, asthma, gastroesophageal reflux disorder, ("GERD"), a left sided ovarian cyst and pancreatic masses of unknown etiology. (R. at 214.) He listed her current medications as Verapamil, hydrochlorothiazide,

-14-

Benazepril, Prilosec, Albuterol metered dose inhaler as needed for shortness of breath and a C-PAP machine. (R. at 214.) On September 11, 2000, Lawhorne underwent a distal pancreatectomy with splenectomy intraoperative ultrasound. (R. at 222.) After excision, Lawhorne had no peritoneal implants or liver metastasis on exploratory laparotomy, and no other abnormalities were noted. (R. at 222.) Lawhorne did have a multiloculated neoplasm of the body/tail of the pancreas. (R. at 222.) The ultrasound showed that this multiloculated neoplasm was to the left of the superior mesenteric vein and the portal vein and there did not appear to be local invasion; it was well capsulated within the principally inferior portion of the pancreas. (R. at 222.) Upon discharge on September 16, 2000, Lawhorne was diagnosed with cystic neoplasm distal tail of the pancreas and placed back on all previous medications plus Percocet and docusate sodium. (R. at 220.)

On April 19, 2001, Lawhorne had a follow-up visit, which revealed a new hernia development under her right breast. (R. at 211.) On July 9, 2001, Lawhorne was sent to the radiology department at UVA for a mammogram and a pelvic ultrasound. (R. at 347-48.) The mammogram revealed an interval increase in density consistent with hormone replacement therapy, and the ultrasound showed a 5 x 4 x 5 centimeters simple left ovarian cyst without change since April 2001, and two small adjacent cysts in the right ovary, the larger one measuring two centimeters, also without change since April 2001. (R. at 347-48.) Throughout the remainder of 2001, Lawhorne was seen for weight management treatment and another sleep analysis report. (R. at 334, 338-346.) The sleep analysis report indicated that Lawhorne still suffered from moderate sleep apnea, and the recommended treatment included a Nasal C-PAP 11cm H2O with oxygen at 2 L/min. (R. at 334.)

-15-

Lawhorne returned to UVA's Department of Radiology for another pelvic ultrasound on January 11, 2002, where she was again diagnosed with bilateral ovarian cysts, none of which have changed in size since her last ultrasound. (R. at 331.) On February 7, 2002, the Diabetes Community Network reported that Lawhorne was continuing with conventional nutritional weight loss therapy with a reduction in total calories and an improvement in her lifestyle; however, the nutritionist reported that over the past few weeks, Lawhorne had a decreased vigilance to her nutrition management because of a sinus problem resulting from her use of the C-PAP machine. (R. at 327.)

On March 11, 2002, Lawhorne was seen by Dr. Sharon A. Esau, M.D., at UVA sleep disorder clinic. (R. at 322-25.) At this meeting, Lawhorne's chief complaints was sinus problems, yellow drainage, chronic headache and sinus tenderness subsequent to completing a prescription of Bactrim. (R. at 322.) Dr. Esau reported Lawhorne's current medications as Zocor, Verapamil, Benazepril, hydrochlorothiazide, Nexium and Flonase. (R. at 323.) Lawhorne was diagnosed with moderate obstructive sleep apnea, obesity, hypertension and questionable sinusitis. (R. at 324.) Dr. Esau stated that she would have humidity added to the C-PAP unit and prescribed Bactrim for a 21-day course. (R. at 324.)

On May 13, 2002, Lawhorne was seen by Lorraine Borish, N.P., in UVA's sleep disorder center for a follow-up visit. (R. at 315-17.) Lawhorne's chief complaint at this visit was that she was having difficulty breathing during the day and it was getting worse; she was attributing this to a current weight gain. (R. at 315.) Lawhorne was diagnosed with moderate obstructive sleep apnea, morbid obesity, hypertension,

Case 2:03-cv-00014-GMW-PMS   Document 14   Filed 11/16/05   Page 16 of 27   Pageid#: 59

hyperlipidemia, dyspnea and chest tightness. (R. at 316.) Borish stated that she would arrange to have a nocturnal home oximetry obtained based on the chance that Lawhorne might be desaturating, which could be contributing to her problems, and Borish encouraged her to lose weight and exercise. (R. at 316.) Three days later, Lawhorne returned to UVA because of chest tightness and "labored breathing." (R. at 320.) The attending physician gave her additional treatment for sinusitis. (R. at 320.)

On June 6, 2002, the Heart Center at UVA reported that a transthoracic echocardiogram procedure revealed that Lawhorne had normal left ventricular function and size but mild pulmonary hypertension. (R. at 298.) On June 20, 2002, Lawhorne followed up with the heart center because of the continued daily shortness of breath and cough. (R. at 296.) The attending physician increased the Advair prescription because Lawhorne claimed she improved when taking that medication. (R. at 296.) On June 21, 2002, Lawhorne had a CT scan of her chest that revealed multiple sub-centimeter, "shotty" nodes in the pre-tracheal, pre-carinal, left lower paratracheal and AP window regions. (R. at 312.) It also revealed a pathologically enlarged node measuring 15 mm in short axis and soft tissue density within the right hilar and infrahilar. (R. at 312.) Also the scan revealed two small pericardiophrenic nodes and an anterior abdominal wall hernia. (R. at 312.) Lawhorne was diagnosed with malignancy with the largest or primary malignancy in the left lower lobe and diffuse metastatic disease was suggested. (R. at 313.) The attending physician also said that a bronchoalveolar cell could be assessed percutaneously with another CT. (R. at 313.)

On July 8, 2002, the Diabetes Community Network reported that Lawhorne had

-17-

improvement in her lipid profile and that she was making an effort toward weight loss. (R. at 309.) On July, 9, 2002, Lawhorne went to UVA for a follow-up visit, and the physician scheduled a CT guided biopsy on her lungs for further observation. (R. at 310.) On July 15, 2002, Lawhorne had a mammogram performed, which reported negative to any masses or signs of carcinoma. (R. at 286.) The physician recommended a follow-up mammogram in one year. (R. at 286.) On the same day, a pelvic ultrasound was taken that revealed the cyst in Lawhorne's left ovary had slightly increased, but no overall significant changes were seen since the last ultrasound. (R. at 288.) On July 17, 2002, Lawhorne underwent a lung biopsy to test for cancer. (R. at 305.) The preliminary diagnosis from the biopsy was that the sample consisted of benign pulmonary elements and rare atypical cells; however, they were not diagnostic of malignancy. (R. at 305.) The report stated that there were rare structures suggestive of granulomas. (R. at 305.) The physician noted that the region appeared to be more cavitary than solid. (R. at 276.) A post-biopsy view of the chest on July 17, 2002, showed no signs of a pneumothorax. (R. at 282.)

On July, 25, 2002, Lawhorne had a follow-up examination after the lung biopsy, and the physician recommended a bronchoscopy as opposed to another lung biopsy. (R. at 304.) On August 13, 2002, Lawhorne returned for a follow-up exam where she had chest views taken that reported increased opacity within the left lower lobe, which was slightly worse as compared to earlier studies, but there were no new airspace opacities or nodules. (R. at 274.) On the same day, Lawhorne was seen in UVA's pulmonary clinic where they reported current medications as Zocor, Verapamil, hydrochlorothiazide, Nexium, Flonase and Advair. (R. at 276.) The attending physicians performed a pulmonary function analysis, which showed an isolated diffusions defect that might suggest early interstitial or pulmonary vascular disease.

(R. at 301.) During a follow-up exam on August 29, 2002, a thorax CT revealed an improved appearance of the left lower lobe opacity with it being less mass-like and that the associated adenopathy had decreased in size. (R. at 272.) Lawhorne also was tested for tuberculosis, which was negative. (R. at 267.)

On November 6, 2002, a follow-up thorax CT scan was performed, which showed that sub-centimeter mediastinal lymphadenopathy was again detected; however, several lymph nodes had increased in the interval. (R. at 256.) Also noted were coronary artery calcifications and nodular density within the left lower lobe that had increased significantly since comparison in the last exam. (R. at 256.) Furthermore, a 7 millimeter non-calcified pulmonary nodule was detected within the lingular lobe and the area of previously described scarring at the right lung base had also increased in size, now measuring 2.6 centimeter in diameter. (R. at 256.) The report also showed an adjacent 1.2 centimeter pulmonary nodule medially at the right lung base, and multiple sub-centimeter pulmonary nodules were present in the right lung, many of which were new since the last scan. (R. at 256.) The report also stated that an exam of the upper abdomen revealed a wide-mouth upper abdominal ventral hernia containing colonic loops with no evidence of incarceration. (R. at 256.) The physician noted that the pathologic gastrohepatic lymphadenopathy was without significant change. (R. at 257.)

On November 11, 2002, a pelvic scan reported that Lawhorne had a stable left ovarian simple cyst with the right ovary not being able to be seen. (R. at 254.) On December 23, 2002, UVA physicians attempted to perform a CT guided bronchoscopy due to concern for bronchoalveolar carcinoma or infection. (R. at 379.) The physicians attempted to guide forceps into the lesion in Lawhorne's left lower lobe

Case 2:03-cv-00014-GMW-PMS   Document 14   Filed 11/16/05   Page 19 of 27   Pageid#: 62

lateral segment, but they were not successful; however, a lavage was performed on the left lower lobe. (R. at 379.) The physician further noted that chronic inflammation and multinucleated histiocytes were present and that there was no evidence of malignancy. (R. at 244.)

On January 13, 2003, a follow-up CT scan of Lawhorne's chest and abdomen were performed. (R. at 241.) The chest CT scan showed that the left lower lobe mass was unchanged in size, although less dense and more aerated. (R. at 242.) It also showed that the right lower lobe lesion similarly changed in appearance and was somewhat larger in size. (R. at 242.) The physician stated that these changes suggested inflammatory rather than a neoplastic process. (R. at 242.) Scattered sub-centimeter pulmonary nodules bilaterally and scattered sub-centimeter mediastinal lymph nodes were shown, but they were unchanged in appearance. (R. at 242.) The abdominal CT scan showed retro portal lymph nodes and gastrohepatic lymph nodes that were pathologic by size criteria but stable as compared to prior exams. (R. at 242.) It also showed a soft tissue mass encasing the right hepatic artery that was unchanged in appearance. (R. at 242.) The attending physician stated that the etiology of the findings were uncertain because they could possibly have been related to the surgery, but recurrent neoplastic disease was also considered. (R. at 242.)

On January 16, 2003, Lawhorne returned to UVA for a follow-up visit and continued to complain of occasional shortness of breath, sinus problems and a 10 pound weight gain over the holidays. (R. at 237-38.) She was instructed to continue taking Flonase and prescribed Bactrim again. (R. at 238.) The test results were reviewed by Dr. Thomas M. Daniel, M.D., of UVA's Department of Surgery. (R. at 234-35.) He stated that after reviewing Lawhorne's CT scans, he found that the

-20-

lesions became less dense and more air-filled, which led the Multispecialty Thoracic Tumor Board to feel that it was a sign that they were slowly clearing and that they did not represent metastatic or primary neoplasia. (R. at 235.) He also stated that he could not rule out bronchoalveolar cell carcinoma, but that was not high on his list of diagnoses. (R. at 235.) He then stated that Lawhorne should not proceed with any invasive surgical biopsies due to her size. (R. at 235.)

On April 17, 2003, Lawhorne had a follow-up visit and complained of tiredness all day, shortness of breath that had not significantly changed, reoccurrence of "chills" in the past week and more recently, she stayed cold all the time. (R. at 232.) The attending physician recommended another CT scan of Lawhorne's lungs and abdomen as soon as possible. (R. at 232.) On April 29, 2003, Lawhorne had another CT scan of her abdomen and chest. (R. at 230.) The chest scan showed a resolving left lower lobe mass with residual scarring with an interval decrease in size of the right lower lobe mass. (R. at 230.) The physician stated that these findings most likely represented inflammatory rather than neoplastic processes. (R. at 230.) He also stated that there were still several unchanged tiny linear and nodular opacities in the left upper lobe and a 5 mm nodule in the left lingula. (R. at 230.) The chest scan reported an interval decrease in the size of several pre-vascular and mediastinal sub-centimeter lymph nodes and unchanged subdiaphragmatic lymph nodes. (R. at 230.) The abdomen scan showed a stable retro portal and gastrohepatic pathological lymphadenopathy and a stable soft tissue mass near the post-surgical site adjacent to the right hepatic artery, which may have represented post operative changes or recurrent neoplastic disease. (R. at 230.) The abdominal scan further revealed a heterogeneous mass in the right lower quadrant, which may have represented bowel versus metastases. (R. at 230.) The physician noted that a follow-up examination of

-21-

the pelvis was necessary to further evaluate the mass. (R. at 230.)

On May 5, 2003, Lawhorne had a follow-up pelvic ultrasound that showed a stable left ovarian anechoic simple cyst and no evidence of a right adnexal mass. (R. at 227.) On June 10, 2003, Lawhorne returned to UVA for a follow-up visit. (R. at 14.) During this visit, the attending physician stated that Lawhorne's asthma was poorly controlled and placed her on Singulair. (R. at 14.) The physician also found Lawhorne's hypertension to be stable, that she was being treated by Dr. Adams for her abdominal mass, that her hypothyroidism was normal and that her sleep apnea needed to be continually treated by a BiPAP as per the pulmonary clinic. (R. at 14.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims under the Act. *See* 20 C.F.R. § 416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to her past relevant work; and (5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is

Case 2:03-cv-00014-GMW-PMS   Document 14   Filed 11/16/05   Page 22 of 27   Pageid#: 65

unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated August 29, 2003, the ALJ denied Lawhorne's claim. (R. at 24-32.) The ALJ found that Lawhorne had not engaged in substantial gainful activity since the alleged onset of her disability. (R. at 31.) The ALJ found that Lawhorne had an impairment or combination of impairments that were considered "severe," but the ALJ found that Lawhorne's impairments did not meet or medically equal one of the listed impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 31.) The ALJ found that Lawhorne's allegations regarding her limitations were not totally credible and that she had the residual functional capacity to perform sedentary, light and medium work that did not "expose her to heights or unusual hazards where she or others would be exposed to risk of serious harm if she were to fall asleep." (R. at 31.) The ALJ found that Lawhorne had a high school education and that she retained transferable skills from her past relevant work. (R. at 31-32.) Finally, the ALJ found that Lawhorne was able to perform her past relevant work as a owner/operator of a convenience store and, therefore, was not under a "disability" as defined by the Act at any time through the date of the decision. (R. at 31-32.) *See* 20 C.F.R. § 416.920(g) (2005).

Lawhorne argues that the ALJ's decision is not supported by substantial evidence. Specifically, Lawhorne argues that the ALJ erred by not addressing the credibility of the plaintiff's allegations. (Plaintiff's Brief In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 7.) Lawhorne further argues that the ALJ erred by not finding her respiratory impairments severe and then erred by not considering the combined effects of her severe obesity, sleep apnea and respiratory impairments. (Plaintiff's Brief at 9.) Lastly, Lawhorne argues the ALJ erred by not properly considering the effects of Lawhorne's obesity on her ability to work. (Plaintiff's Brief at 12.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings and whether the findings were reached through application of the correct legal standards. *See Coffman,* 829 F.2d at 577. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers,* 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger,* 528 F.2d 1153, 1156 (4th. Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the

wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), and ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Lawhorne argues that the ALJ erred by not addressing the credibility of the plaintiff's allegations according to Social Security Ruling ("S.S.R.") 96-7p, WEST'S SOCIAL SECURITY REPORTING SERVICE, (West Supp. 2005). (Plaintiff's Brief at 7.) However, this is simply untrue. In the opinion dated August 23, 2001, which was incorporated by reference in the later ALJ opinion dated August 29, 2003, the ALJ found that Lawhorne's allegations of totally incapacitating fatigue due to sleep apnea were not entirely credible. (R. at 50.) In making this credibility determination, the ALJ cited the fact that Lawhorne was the primary care giver for her elderly mother until her mother was placed in a nursing home, as evidence that Lawhorne was physically capable of more than she alleged. (R. at 50.) The ALJ further cited the fact that Lawhorne discontinued the use of her C-PAP machine, on her own initiative, and this machine previously had alleviated some of her difficulties associated with her sleep apnea. (R. at 50.) Similarly, state agency physicians who found Lawhorne's allegations not totally credible and her complaints disproportionate to her records. (R. at 50-51.) In making his credibility finding, the ALJ noted and emphasized on the findings of the DDS. (R. at 50-51.) Therefore, it is clear from the ALJ's opinion that he did, in fact, make a credibility finding regarding Lawhorne, and he throughly explained how he reached the decision that Lawhorne was not fully credible.

Lawhorne next argues that the ALJ erred by not finding her respiratory impairments severe and then further erred by not considering the combined effects of

her severe obesity, sleep apnea, high blood pressure and severe respiratory impairments. (Plaintiff's Brief at 9.) However, the ALJ did take note of Lawhorne's respiratory problems. In his opinion dated August 29, 2003, the ALJ pointed out that Lawhorne had a bronchoscopic examination of her lungs, and it did not indicate a disabling lung condition. (R. at 29.) The ALJ also noted that Lawhorne testified, at her hearing, that her pulmonary problems were under control. (R. at 29, 404.) Therefore, the ALJ did consider and correctly conclude that Lawhorne did not suffer from a severe respiratory condition, other than sleep apnea; thus, there was no error in only considering the combined effects of Lawhorne's severe sleep apnea, high blood pressure and obesity. Also, the ALJ did not violate S.S.R. 96-8p, WEST'S SOCIAL SECURITY REPORTING SERVICE, (West Supp. 2005), which requires the ALJ to consider both severe and non severe impairments. Throughout the ALJ's opinion, he cited Lawhorne's medical records, and he stated that he reviewed all of her medical records in order to reach his final determination regarding Lawhorne's disability. (R. at 24-32.)

Lawhorne's last argument is that the ALJ erred by not properly considering the effects of her obesity on her ability to work. (Plaintiff's Brief at 12.) The ALJ found Lawhorne to be morbidly obese, and her obesity "exacerbate[d] her other impairments." (R. at 26.) The ALJ further stated that he considered all of Lawhorne's symptoms that he could reasonably accept as consistent with the objective medical evidence and other evidence based on the requirements as set forth by 20 C.F.R. § 404.1529 (2005), and S.S.R. 96-7p. (R. at 26.) Therefore, the ALJ did consider the effects of Lawhorne's obesity on her ability to work and did not err.

Case 2:03-cv-00014-GMW-PMS   Document 14   Filed 11/16/05   Page 26 of 27   Pageid#: 69

## III. Conclusion

For the foregoing reasons, the Commissioner's motion for summary judgment will be sustained; Lawhorne's motion for summary judgment will be overruled; and the court will affirm the Commissioner's decision denying benefits.

An appropriate order will be entered.

DATED:      This _10th_ day of November, 2005.

                                    SENIOR UNITED STATES DISTRICT JUDGE